DOUGLAS CARTER, Plaintiff-Appellant, v. G C ELECTRONICS *et al.*, Defendants-Appellees.

Second District   No. 2—91—0510

Opinion filed August 18, 1992.—Rehearing denied September 29, 1992.

Robert A. Fredrickson, of Reno, Zahm, Folgate, Lindberg & Powell, of Rockford, for appellant.

Roberta L. Holzwarth and Richard D. Gaines, both of Holmstrom & Kennedy, of Rockford, and William Van Hagey and David C. Bogan, both of Van Hagey & Bogan, Ltd., of Libertyville, for appellees.

JUSTICE BOWMAN delivered the opinion of the court:

Plaintiff, Douglas Carter, appeals from an order of the circuit court of Winnebago County which granted summary judgment in favor of defendant, Household Manufacturing, Inc. (Household). Plaintiff, a former employee of Household, brought this action alleging that defendant discharged him in retaliation for his refusal to participate in the misappropriation of company funds by an officer of the company. On appeal plaintiff asserts that his reply to defendant's motion

raised a genuine issue of material fact regarding defendant's motive for discharging him, thereby precluding summary judgment.

Carter was employed as the division controller for G C Electronics (GC), a division of Household. He reported directly to Wayne Timpe, the president of GC. In September 1986 Timpe told Carter that Household had approved the settlement of a racial discrimination claim made by a former GC employee. The company had authorized $42,000 for the settlement, but the employee would not agree to anything less than $50,000. Timpe asked Carter to prepare a check for $50,000 for the employee and explained that he, Timpe, would personally reimburse the company for the $8,000 difference between the amount of the settlement check and the amount authorized by Household. Timpe further indicated that he wanted the additional $8,000 payment to be hidden from Household management and held until he repaid it. Carter responded that he could hold the payment until the end of the year but, upon closing the books, it would have to be shown as an employee receivable.

On January 6, 1987, Carter told Timpe the time had come to close the books and asked him what he wanted done with the $8,000 excess payment. Timpe told Carter to show it as an expense and indicated that he would get approval for it from Terence McCarthy, his superior at Household. Carter expensed the $8,000 in one or more categories and closed the books for 1986.

One week later, January 13, 1987, Timpe notified Carter that Household was merging GC with Thorsen Tool Company, another Household operating division. Pursuant to the merger, Carter's job was being eliminated, and he was not going to be hired for the position of controller for the new, merged division of Household.

Another week later, January 21, 1987, Carter, along with Timpe, signed a letter addressed to Don Holmes, the controller of Household. The letter, which Carter called a "representation letter," addressed the year-end financial statements and other accounting data submitted by GC to Household's corporate office. The letter represented that the data were correct and accurate and had been handled properly and that there had been no irregularities involving management or employees which could have an effect on the financial statements.

In a letter dated February 3, 1987, Timpe confirmed to Carter that he was being terminated from GC. Timpe explained that he had decided to look for a new person to fill the controller position in the combined GC-Thorsen division because the job had additional requirements and he did not think Carter would be able to fulfill those requirements. Ultimately, a Household finance manager was named con-

troller of the new entity. The controller at Thorsen had also been eliminated from consideration for the job.

Sometime in February or March Carter called the Household legal department and determined that the amount of the settlement with the former GC employee was still recorded as $42,000, not $50,000. He then called Holmes, the corporate controller, and explained what had happened regarding the payment of the excess $8,000 to the former employee. Prior to this time no one knew about the overpayment except Timpe and Carter. Carter's last day at GC was the first Friday in April 1987.

On April 26, 1988, Carter filed a one-count complaint alleging that Timpe discharged him in retaliation for his questioning of an illegal transaction. In its motion for summary judgment Household asserted, among other things, that Carter was terminated because his job was eliminated in the course of a corporate reorganization and he was not qualified for the new, more responsible position as controller of the reorganized entity. Following Carter's response, the trial court essentially indicated that, based on the evidence which had been submitted in support of and in opposition to the motion, the plaintiff had not raised a genuine issue of material fact on the question of the motivation for his discharge. The court found that plaintiff was discharged because his job was abolished. Absent discharge in retaliation for something he did or refused to do, the plaintiff could not show the existence of the tort of retaliatory discharge. Accordingly, the court granted the motion for summary judgment. Plaintiff then brought this timely appeal.

Plaintiff posits that the trial court erred because it disregarded his evidence, from which it could be inferred that he was fired for refusing to participate in an illegal transaction. Plaintiff's position cannot be sustained.

Summary judgment is proper when the pleadings, depositions, admissions, and affidavits on file demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. (Ill. Rev. Stat. 1989, ch. 110, par. 2— 1005; *Fuentes v. Lear Siegler, Inc.* (1988), 174 Ill. App. 3d 864, 866.) The purpose of summary judgment is not to try an issue of fact but to determine whether a triable issue of fact exists. (*Fuentes,* 174 Ill. App. 3d at 866; *Sloan v. Jasper County Community Unit School District No. 1* (1988), 167 Ill. App. 3d 867, 870.) On defendant's motion for summary judgment a plaintiff is not required to establish his case as he would at trial, but he must present some factual basis that would arguably entitle him to a judgment. (*Fuentes,* 174 Ill. App. 3d

at 866; *Martin v. 1727 Corp.* (1983), 120 Ill. App. 3d 733, 737.) These fundamental principles guide our inquiry.

■■ ■ A plaintiff states a valid claim for retaliatory discharge by alleging he was (1) discharged, (2) in retaliation for his activities, and (3) that the discharge violates a clear mandate of public policy. (*Hinthorn v. Roland's of Bloomington, Inc.* (1988), 119 Ill. 2d 526, 529; *Russ v. Pension Consultants Co.* (1989), 182 Ill. App. 3d 769, 774.) While in retaliatory discharge cases the issue of the employer's motive for terminating an employee should not readily be the subject of summary judgment (*Austin v. St. Joseph Hospital* (1989), 187 Ill. App. 3d 891, 897; *Fuentes*, 174 Ill. App. 3d at 866-67; *Hugo v. Tomaszewski* (1987), 155 Ill. App. 3d 906, 909-10), summary relief has been granted where the plaintiff failed to present evidence sufficient to raise a genuine issue of material fact. In *Fuentes v. Lear Siegler, Inc.* (1988), 174 Ill. App. 3d 864, plaintiff claimed he was discharged in retaliation for pursuing his right to worker's compensation. The undisputed facts showed that plaintiff was terminated after he admitted committing a major safety violation. They demonstrated, too, that defendant did not know of plaintiff's intentions regarding worker's compensation because plaintiff had neither taken steps to file a claim nor discussed such a claim with his employer prior to termination. Plaintiff's only evidence, his affidavit statement that he was not aware of the safety rule, did not raise a material factual question as to defendant's motive for discharging plaintiff. Consequently, this court affirmed summary judgment in favor of the employer. In *Armstrong v. Freeman United Coal Mining Co.* (1983), 112 Ill. App. 3d 1020, another worker's compensation case, summary judgment for the employer was affirmed where the plaintiff was terminated as part of a general cutback in employment in his section, the plaintiff did not file his worker's compensation claim until two months after he was terminated, and the plaintiff never told the employer that he was going to file a worker's compensation action. Plaintiff's only evidence consisted of affidavits of co-workers who espoused an unfounded and unexplained belief that the company had a policy of retaliatory discharge. This was not sufficient to raise a genuine question as to defendant's motive. Plaintiff in this case, like the plaintiffs in *Fuentes* and *Armstrong*, has also failed to raise a genuine issue of material fact as to why he was fired.

Carter does not dispute that he did not contact corporate officials regarding the improper procedure until after he was terminated. It is not disputed either that, at the time Carter was terminated, Household was reorganizing its GC and Thorsen Tool divisions into one

larger division; that Carter's was one of two controller positions—one at GC and one at Thorsen—eliminated in the process; or that neither Carter nor the former Thorsen controller was offered the expanded controller job with the new company. The relevant evidence submitted by plaintiff goes to Timpe's knowledge of plaintiff's alleged refusal to cooperate.

Timpe testified at his deposition that Carter asked him about the $8,000 payment early in 1987, before Carter was told that he was going to be terminated. In his appellate brief, plaintiff focuses heavily on this January 6, 1987, incident. He characterizes the conversation as important in that (1) it showed Carter was following up on the transaction and "was requiring an explanation," and (2) it "alerted Wayne Timpe that Carter was going to balk as to the transaction unless there was something that confirmed its legality." However, upon close examination the discussion on January 6 is not persuasive that Timpe thereby became aware that he had something to fear from Carter.

During his own deposition Carter was questioned about the January 6 conversation by defendant's attorney. The questions and Carter's responses were as follows:

"Q. Let me ask you to give us the exact words of direction that Mr. Timpe gave you as best you can, understanding that that was two years ago.
\*\*\*
A. I asked him, 'What did you do with the $8,000?' He looked at me and said, 'Expense that off, and I'll talk to Terrance [*sic*] about getting this okayed.'
Q. Did you say, 'I thought you were going to pay this out of your own pocket' or words to that effect?
A. No, I did not. \*\*\*
\* \* \*
Q. Did you express any misgivings about that course of conduct at that time?
A. Well, at the time he told me—he said he was going to get it approved by his boss. \*\*\*
Q. Did you ask to see any paperwork on this at that time?
A. No, I did not.
\* \* \*
Q. Do you think there was anything wrong with what you were doing at the time? \*\*\*
A. At the moment that was okay because he told me he was going to get it approved with his boss."

Although he explained that he was not in a strong position to confront Timpe because he did not have the supporting documentation, Carter also indicated in his deposition that he had never threatened, confronted, or had harsh words with Timpe about the $8,000 hidden on the company books. Nor had Timpe ever threatened him when he inquired about it. Regarding his own reaction to Timpe's directions on January 6, Carter answered:

"Q. *** The first week of January, 1987, you didn't have a problem with the way the transaction was entered in the books of account; is that correct?

A. Right.

Q. And you didn't tell Mr. Timpe that you had a problem with the way that transaction was entered into the books of account; is that right?

A. That's right.

Q. Did you give him any other nonverbal or other clue that you had a problem with that transaction on the first week of January, 1987?

A. No."

Carter's own testimony about the January 6 conversation reveals nothing that would have made Timpe aware Carter was reluctant or had reservations or concerns about continuing to conceal the $8,000 payment. Indeed, Carter evidently was *not* concerned. Granted, he may not have been concerned because he was given the impression that Timpe planned to get Household's authorization. Nevertheless, he testified to nothing which suggests that after January 6, 1987, Timpe knew Carter was not going to cooperate in the alleged illegal conduct.

That Timpe remained unaware of any reluctance on Carter's part is especially compelling in light of the uncontested evidence that, both before and after he was discharged, Carter cooperated fully with Timpe. At Timpe's request, Carter knowingly made out a settlement check for $8,000 more than Household had authorized. Carter agreed to and in fact did conceal the overpayment on the company books. As we discussed above, when the time came to account for the $8,000, Carter agreed to and in fact did relegate that amount to various expense accounts, even though he knew such a procedure had not been authorized by Household. It was Carter who then closed the books for 1986. Subsequently, even though he had been terminated, Carter signed the letter representing to Household that there were no irregularities in GC's financial statements. At his deposition Carter testified regarding the overall situation as of the time he signed that letter:

"Q. Well, as of January 21, 1987, [Timpe] certainly didn't have to worry about you as his controller turning him in, did he?

\*\*\*

You did everything he asked you to do, didn't you?

A. Yes; I did up to that point."

■ We conclude that plaintiff's evidence does not show that Timpe was aware plaintiff was going to refuse to participate in allegedly illegal conduct and does not support the inference that plaintiff was discharged in retaliation for such a refusal. The only reasonable inference to be drawn is that plaintiff was discharged because his job was eliminated. Consequently, there is no material factual question as to defendant's motive for terminating plaintiff's employment. Absent a discharge in retaliation for plaintiff's refusal to participate in alleged illegal activities, one element of retaliatory discharge cannot be shown, and summary judgment was properly granted in favor of defendant.

■ On a final note we briefly address plaintiff's related contention that he was not given the new controller's position at GC-Thorsen because of his refusal to cooperate with Timpe. We observe first of all that plaintiff cites no authority, and we are aware of none, which stands for the proposition that a retaliatory discharge cause of action will lie for failure to promote an employee. Nor does plaintiff point to any duty on the part of Household to promote him. A somewhat analogous situation was considered in *LaPorte v. Jostens, Inc.* (1991), 213 Ill. App. 3d 1089, where the plaintiff acknowledged that her employment was terminated because her injury made it impractical and unsafe for her to continue at her present position. Nevertheless, she maintained that defendant was obliged to transfer her to another available position rather than terminate her employment. The court first noted that in Illinois an employer is not obligated to retain an at-will employee who is medically unable to return to his assigned position. The court then stated that, without more, the mere fact that the plaintiff might have been able to perform other jobs for the employer was irrelevant to whether she was wrongfully discharged. Summary judgment for the employer was affirmed.

Similar to the plaintiff in *LaPorte*, plaintiff here appears to contend that, even though his current job was eliminated, he should have been given the new controller's position. Like the *LaPorte* court, we think that, absent a duty on the part of the employer, the fact that Carter might have been able to do the new job is irrelevant to

whether he was discharged for the wrong reasons and is ineffective in challenging defendant's motion for summary judgment.

For the reasons stated above, the order of the circuit court of Winnebago County granting summary judgment in favor of defendant is affirmed.

Affirmed.

WOODWARD and GEIGER, JJ., concur.